# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2265 | **DATE** | 9/16/2004 |
| **CASE TITLE** | Indeck Energy Services, Inc., et al vs. NRG Energy, Inc., et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
        ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]   Enter Memorandum Opinion And Order.  Waukesha's motion for summary judgment (Doc. No. 23-1) is granted.  Judgment is entered in favor of Waukesha and against Indeck and I-PV in the amount of the unpaid purchase price of $3,002,400 for the 105080 transformers.  It is further ordered that Indeck and I-PV pay Waukesha: (1) $58,815 for the re-shipment of the transformers; (2) $30,000 for the preparation of the transformers for storage; and (3) $5,400 per month from October 2002 to date, for the storage of the transformers.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | 3 | |
| ✓ | Notices mailed by judge's staff. | | number of notices | |
| | Notified counsel by telephone. | SEP 17 2004 | | |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 9/16/2004 | |
| | | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

INDECK ENERGY SERVICES, INC., an )
Illinois corporation, and INDECK-PLEASANT )
VALLEY, LLC, an Illinois limited liability )
company, )
           )
           Plaintiffs, )
           )
           v. )     No. 03 C 2265
           )
NRG ENERGY, INC., a Delaware corporation, )     Judge Rebecca R. Pallmeyer
and WAUKESHA ELECTRIC SYSTEMS, INC., )
a Wisconsin corporation, )
           )
           Defendants. )

DOCKETED
SEP 1 7 2004

## MEMORANDUM OPINION AND ORDER

This breach-of-contract suit began when Plaintiff, Indeck Energy Services, Inc. ("Indeck")

sought a declaratory judgment that it is not required to pay for certain electronic equipment that

Indeck ordered from Defendant Waukesha Electric Systems, Inc. ("Waukesha") in late 2000.

Waukesha filed a counterclaim asserting that it timely manufactured and shipped three customized

electrical transformers ordered by Indeck, and that Indeck breached the contract by refusing to pay

for them. Waukesha now seeks summary judgment on its claim for payment. Indeck argues that

there are genuine issues of material fact concerning Waukesha's compliance with the terms of the

parties' agreement: Specifically, Indeck argues that Waukesha acted unreasonably when it

withheld consent to the requested assignment of the three transformers to a third party, NRG

Energy, Inc. ("NRG"). For the reasons explained here, the court grants summary judgment in favor

of Waukesha.

## STATEMENT OF FACTS

Counterclaim plaintiff Waukesha is a Wisconsin corporation in the business of designing,

manufacturing, and selling equipment used for the generation of electricity. (Waukesha's Local

Rule 56.1(a)(3) Statement of Uncontested Facts (hereinafter, "Waukesha's 56.1") ¶ 1.) Waukesha



seeks summary judgment against Indeck, an Illinois corporation that develops and operates power generation plants, and Indeck-Pleasant Valley, LLC ("I-PV"), a limited liability company that serves as a special purpose subsidiary of Indeck, but has no separate offices from Indeck, has no employees, and does not issue paychecks. (*Id.* ¶¶ 2, 3.)

This case concerns three generator step-up ("GSU") transformers that Indeck ordered from Waukesha. A GSU transformer is a piece of power equipment used to change the voltage of electricity supplied by an electrical generator so that the generator may be connected to an electrical grid. (*Id.* ¶ 8.) The side of the transformer that connects to the power generator is called the "low side" of the transformer, and the side that connects the electrical grid is called the "high side." A GSU transformer may only be used with generators and electrical grids that conform to the specific low and high side voltages it produces. (*Id.* ¶ 11.)

## A.    Order 105080

On October 23, 2000 Indeck issued Order 105080 to Waukesha for three GSU transformers. (*Id.* ¶ 7, 13.) These transformers were to be used at a power project that Indeck was developing in Bourbonnais, Illinois, called the Bourbonnais Project. (Counterclaim Defendants, Indeck Energy Services, Inc. and Indeck-Pleasant Valley, LLC's Additional Statement of Uncontested Facts (hereinafter, "Indeck's 56.1 Response") ¶ 4.) Order 105080 specified the technical requirements for the three transformers, including a low side voltage of 15.6 kilovolts, which Indeck's president Tom Campone labeled as "odd." (Waukesha's 56.1 ¶¶ 15, 17; Purchase Order 105080, Ex. D to Waukesha's 56.1.) Campone testified that the "odd low side" voltage was required so that the transformers would "specifically match up with the combustion turbine [generators] that we purchased from Siemens Westinghouse." (Campone Dep., Ex. A to Waukesha's 56.1, at 27-28.) Campone explained that the Siemens Westinghouse generators that Indeck planned to use with the ordered transformers were built in Germany according to "European standards for voltage [that] tend to be different than the U.S. standards." (*Id.*, at 27.)

Consequently, the 105080 transformers are not compatible with any generator other than specific combustion generators manufactured by Siemens Westinghouse. (Waukesha's 56.1 ¶ 20.) Indeck specified a high side voltage of 138 kilovolts, which is "critical because that [voltage] determines the interconnection voltage" with the Commonwealth Edison power grid. (*Id.* ¶ 22; Campone Dep., at 26-28.) In addition to the low and high side voltage requirements, Order 105080 contains thirteen pages of additional technical specifications, most of which are, according to Indeck, dictated by industry standards. (Waukesha's 56.1 ¶ 24; Indeck's Response to Waukesha's Rule 56.1 Statement of Uncontested Facts (hereinafter, "Indeck's 56.1 Response") ¶ 24.)

The purchase order provided that Indeck would pay in three installments: 10% of the purchase price ($336,600 total), due 30 days after Indeck received approval drawings of the transformers from Waukesha; 80% of the purchase price ($2,668,000 total), due 30 days after Waukesha delivered the transformers; and the final 10% of the purchase price ($336,600), due 60 days after delivery. (*Id.* ¶ 27.) Order 105080 required delivery of the transformers by November 2002 to an unspecified location in "Northern Illinois." (Purchase Order 105080, Ex. D to Waukesha's 56.1, at I0304.) The order includes an assignment clause providing that the order "may not be assigned by either Party without the prior written consent of the other Party, which consent will not be unreasonably withheld." (*Id.* at I0319.) The purchase order identifies Indeck as the owner of the transformers under the contract, and directs that all notices be sent to IP-V. (*Id.* at I0319; Campone Dep., at 55-57; Purchase Order 105080, Ex. D to Waukesha's 56.1, at I0319.)

Waukesha transmitted an acknowledgment of the purchase order to Indeck in November or December 2000. (Waukesha's 56.1 ¶ 35.) In a letter dated December 6, 2000, Indeck Vice President Wayne R. Grayczyk acknowledged receipt of Waukesha's acknowledgment form. (*Id.* ¶ 36.) In his deposition, Campone admitted that "we [Indeck] entered into a contract with Waukesha and we were proceeding as if that contract – we intended to fulfill all of the obligations

3

of that contract." (Campone Dep., at 73.) Following the terms of Order 105080, Waukesha provided Indeck with the specified approval drawings of the transformers in early 2001. (Waukesha's 56.1 ¶ 38.) On March 21, 2001, Indeck issued three invoices in the amount of $111,200 each to fulfill the 10% progress payments due for submission of the approval drawings. (*Id.* ¶ 40.) Indeck paid these progress payment invoices on March 30, 2001, tendering $333,600 to Waukesha. (*Id.* ¶ 41.)

## B.    Role of NRG

NRG was a subsidiary company of Xcel Energy ("Xcel") until 1988 or 1999, when it was offered for public sale. (Campone Dep., at 81-82.) After this sale, Xcel continued to own a substantial percentage of the shares of NRG. (*Id.*) In August 2001, Indeck and NRG completed a transaction in which NRG purchased several power generation projects from Indeck. (Waukesha's 56.1 ¶¶ 42-43.) Waukesha was not a party to this transaction, (*Id.* ¶ 44), but the three transformers sold under Purchase Order 105080 were included in the sale of the Bourbonnais Project to NRG. (Indeck's 56.1 Response ¶ 11.) After this transaction, Indeck continued to act as the developer of the Bourbonnais Project for NRG, though NRG began to assume many of Indeck's responsibilities under Order 105080. (Campone Dep. at 84.) According to Indeck, the parties cooperated in that Indeck acted as a developer of power plants, doing the initial ground work, while NRG was the buyer, constructor, and operator of power plants. (Indeck's 56.1 Response ¶ 15.) For example, after Indeck paid the initial 10% of the purchase price ($336,600) to Waukesha, NRG reimbursed Indeck for those amounts. (Indeck's 56.1 Response ¶ 14.) NRG also assumed other payments of the Bourbonnais Project's bills and expenses and reimbursed Indeck for all such payments made before August 2001. (*Id.* ¶ 18.) In addition to reimbursing Indeck for payments made on the three transformers of Order 105080, NRG also ultimately paid for a fourth transformer manufactured by Waukesha to be used on the Bourbonnais Project. This transformer was originally ordered in May 2000 by IP-V under purchase order 105079,

4

and paid by April 2002. (Waukesha's 56.1 ¶ 52; Indeck's 56.1 Response ¶ 19; Lada Dep., at 53.)

Indeck claims that Waukesha knew as early as February 2002 that the Bourbonnais Project had been sold to NRG and that NRG would be paying for the three transformers. (*Id.* ¶ 23.) Waukesha acknowledged that it did learn of the Indeck-NRG transaction, but argues that the transaction is immaterial to Indeck's continuing responsibility to pay for the transformers, as Waukesha never agreed to relieve Indeck of that obligation. (Waukesha's Response to Indeck's Statement of Additional Facts (hereinafter "Waukesha's Response") ¶ 23.) Waukesha further acknowledges that it took instructions from NRG regarding the manufacture and storage of three transformers as early as February 2002, complying with Indeck's directions that shipment be coordinated with NRG. (Indeck's 56.1 Response ¶ 23.) Waukesha notes that it is common for a customer to ask Waukesha to coordinate manufacture and shipment details with third-party companies. (Waukesha's Response ¶ 23.) Indeck contends that NRG was responsible for payment for the three transformers and that Indeck has no obligation to pay the remaining 90% balance on Purchase Order 105080 because the transformers were owned by NRG. (Indeck's 56.1 Response ¶¶ 24-25.) Waukesha objects to these assertions, insisting that any agreement between Indeck and NRG did not relieve Indeck of responsibility to fulfill its financial obligations under Order 105080. (Waukesha's Response ¶¶ 24-25.)

## C.    Possible Assignment to NRG

In early 2002, NRG wished to obtain a loan and sought to use the power equipment purchased from Indeck as collateral to secure the loan. (Waukesha's 56.1 ¶ 46.) As a result, NRG approached Indeck about executing assignment documents that would give NRG "clear title" to some of the power equipment involved in the Indeck-NRG transactions. (*Id.* ¶ 45; Campone Dep., at 84-85.) On February 20, 2002, Wayne Grayczyk, Vice President of Procurement for Indeck and responsible for issuing Purchase Order 105080 (Indeck's 56.1 Response ¶ 1), issued a letter to Waukesha asking for the assignment of the transformers from Indeck and I-PV to NRG

5

Bourbonnais Equipment, LLC ("NBE").[1]  (*Id.* ¶ 29, 31.)  Indeck claims that despite receiving the request for assignment in February 2002, Waukesha did not begin a credit check on NRG companies for more than two months. (*Id.* ¶ 36.) As Waukesha notes, however, Indeck did initially raise the issue of assignment in Grayczyk's February letter, but no party tendered a proposed assignment for Waukesha's approval until April 2002.   Constance Lada of Indeck's legal department testified that it was not until April 2002 that an NRG attorney sent three proposed "assignment and assumption" documents to Indeck, and requested that Indeck execute the documents and present them to Waukesha for signature. (Waukesha's 56.1 ¶ 47; Lada Dep., Ex. I to Waukesha's 56.1, at 13-14.)

NRG's three proposed assignments related to three different purchase orders that Indeck had submitted to Waukesha: Order 105080 and two earlier orders, numbered 105001 and 105079. (*Id.* ¶ 50.) Indeck issued purchase order 105001 to Waukesha in March 1999 and purchase order 105079 in May 2000, each for the purchase of two GSU transformers.  (*Id.* ¶ 52.)  Both of these previous orders were paid in full, and the transformers had been completed and shipped, at the time NRG tendered its proposed assignment documents to Indeck in April 2002. (*Id.* ¶¶ 53-54.) Waukesha agreed to the assignment to NRG for purchase orders 105001 and 105079. (*Id.* ¶ 56.) Unlike purchase orders 105001 and 105079, however, Order 105080 was not fully paid or completed at the time of NRG's proposed assumption and assignment in April 2002: the November delivery date had not yet passed, Waukesha had not shipped the transformers, and Waukesha had not issued invoices for the remaining 80% and 10% payments that would become due after shipment. (*Id.* ¶ 57.) Thus, 90% of the purchase price for the transformers, or $3,002,400, remained unpaid. (*Id.*)

Under the proposed assignment of Order 105080, NBE would assume all of the financial

---

[1]       NBE is currently a subsidiary of NRG. It was originally set up by Indeck for tax considerations to purchase equipment for the Bourbonnais Project, and was transferred to NRG during the Indeck-NRG transaction in 2001. (*Id.* ¶¶ 31, 33.)

obligations of Indeck, including the remaining balance of $3,002,400. (*Id.* ¶ 60.) Because more than $3 million dollars remained outstanding, Waukesha sought to assess the creditworthiness of NBE before completing the assignment. (*Id.* ¶¶ 58, 63.) Initially created by Indeck, NBE was a newly formed company. After the Indeck-NRG transaction, it became a shell company, operated to gain certain tax benefits for NRG. (*Id.* ¶¶ 61-62; Indeck's 56.1 Response ¶ 62.) Upon consulting Dunn & Bradstreet, Waukesha found no credit history for NBE. (Waukesha's 56.1 ¶ 63.) Indeck's president Campone himself testified, "I don't believe we knew anything about that particular company," (Campone Dep., at 163), though Campone later conjectured that NBE possessed certain combustion turbines which were purchased for the Bourbonnais Project. (Campone Dep., at 152.)

Concluding that it was unable to determine NBE's ability to pay for the transformers, Waukesha asked Indeck or NRG to provide a payment guarantee that NBE would fulfill its payment obligations under Order 105080. (Waukesha's 56.1 ¶ 65; Lada Dep., at 25-26.) Indeck refused to provide any payment assurance relating to the proposed assignment. (*Id.* ¶ 66.) While considering Waukesha's request for a payment guarantee, NRG asked Indeck how much money was still owed on Order 105080, and discovered that more than three million dollars was yet unpaid. (*Id.* ¶ 67; Lada Dep., at 59.) On May 13, 2002, Ray Hoffman of NRG told Indeck's attorney Constance Lada that NBE would not provide any guarantee that NBE would fulfill the payment obligations. (*Id.* ¶ 68; Lada Dep., at 23-24.) Lada testified that during the phone call, Hoffman also related that he was no longer "worried about" Bourbonnais. (Lada Dep., at 74-76.) When asked in her deposition whether this statement by Hoffman meant that the assignment issue for the 105080 transformers was over, Lada refused to answer specifically; she did, however, agree that after this May phone call, "there was really nobody pushing the assignment issue on the 105080 transformers, [and] NRG had dropped it and Indeck wasn't pushing it on its own." (Lada Dep., at 77-78.) Campone recounted that NRG refused to give a payment guarantee because

7

NRG managers felt that the company's credit and history of paying bills were sufficient and the payment guarantee should not have been required. (Indeck's 56.1 Response ¶ 39; Campone Dep., at 16.) NRG did not again request that Indeck and Waukesha consent to an assignment of Order 105080. (Waukesha's 56.1 ¶ 72.)

Indeck's president Campone testified that Waukesha breached the purchase order agreement with Indeck when it unreasonably refused to grant assignment of the transformers to NBE (Campone Dep., at 45-48.) In a letter dated October 15, 2002 to Waukesha Vice President Dennis Wiser, Wayne Grayczyk asserted that Waukesha had unreasonably withheld its consent to the NBE assignment. (Indeck's 56.1 Response ¶ 62; Grayczyk Letter, Ex. P to Indeck's 56.1 Response.)[2]

## D.    Shipping Instructions

On August 26, 2002, Indeck's Grayczyk sent an e-mail instruction to Waukesha requesting that Waukesha ship the transformers to a warehouse in Osseo, Minnesota when the transformers were complete. (Waukesha's 56.1 ¶ 76; Ex. N to Waukesha's 56.1.) These instructions were relayed from NRG through Indeck to Waukesha. (Indeck's 56.1 Plaintiff ¶¶ 72-75.) The specified Osseo, Minnesota warehouse was operated by NRG's corporate affiliate, Xcel, Inc. (Waukesha's 56.1 ¶ 77.) The August 26th email also stated, "ownership of the transformers has been assigned to NRG Bourbonnais, L.L.C." (Id. ¶ 78; Ex. N to Waukesha's 56.1, at I0395-96.) On August 26, 2002, Waukesha's Dave Kirshner responded by email that it had received Indeck's shipping

---

[2]    Indeck also claims that it communicated with Waukesha about this matter repeatedly prior to October 15, 2002 but the record is thin in supporting this contention. Campone stated vaguely that he had "a remembrance that I was told that there were conversations where [it] was repeatedly told to Waukesha" that Waukesha had acted unreasonably. (Campone Dep., at 167-68.) This hearsay statement is insufficient to create a material dispute. In any event, it is contradicted by the statements of other Indeck witnesses, including Indeck's Vice President Grayczyk and its attorney Lada, both of whom testified that Indeck's October 15, 2002 letter was the first time Indeck asserted that Waukesha had acted unreasonably. (Grayczyk Dep., at 87; Lada Dep., at 29, 104-106.)

instructions, but advised that "these transformers have not been assigned by [Waukesha] to NRG." (Ex. N to Waukesha's 56.1, at I0394.) In an internal Indeck email of the same day, Indeck's Lada confirmed that Order 105080 had never been assigned to NRG, admitting that Mr. Kirshner's "understanding of the . . . situation is correct." (Ex. N to Waukesha's 56.1, at I0394.)

Waukesha admits that at Indeck's request, NRG and Waukesha communicated about shipping instructions: Specifically, as early as August 28, 2002, NRG sent directions to Waukesha stating that NRG would not accept shipment of the transformers at that time and that Waukesha should delay shipment. (Waukesha's Response ¶ 73; Indeck's 56.1 Response ¶ 76.) The following day, an independent sales representative advised Waukesha that NRG had directed that Waukesha not ship the transformers to the previously specified Minnesota address, and that NRG was not certain if the transformers would be shipped to Minnesota at all. (*Id.* ¶ 78.) David Kirshner of Waukesha sought clarification from Indeck, but Indeck refused to rescind or alter its August 26, 2002 instruction to ship the transformers to Minnesota. (Waukesha's Response ¶ 76; Kirshner Dep., Ex. B to Waukesha's 56.1, at 86-90.)

Indeck notes that NRG was still financially strong in mid-2002 and cites a payment of twenty-three million dollars from NRG to Indeck for the Bourbonnais project. (Indeck's 56.1 Response ¶ 66.) During the fall of 2002, NRG began having serious financial problems. (*Id.* ¶ 65.) By October 15, 2002, NRG was, in Campone's words, "pretty darn close" to bankruptcy. (Campone Dep., at 168-69.) As Waukesha notes, the first occasion on which Indeck claimed Waukesha acted unreasonably in denying assignment of the transformers to NRG, was also on October 15, 2002, in Grayczyk's letter, at the same time that Indeck became aware of NRG's financial difficulties. (Waukesha's 56.1 ¶ 90, 92.) NRG filed a Chapter Eleven bankruptcy petition on May 15, 2003. (Campone Dep., at 234.)

Waukesha completed the manufacture of the transformers in late August or early September 2002 at its factory in Milpitas, California. (Waukesha's 56.1 ¶ 82.) On September 26,

9

2002, following the standing shipping instruction from Indeck, Waukesha shipped the transformers by freight train from its California factory to the specified Osseo, Minnesota warehouse. (*Id.* ¶ 83.) At that time, rail shipments typically took four to six weeks for completion. (*Id.*) Waukesha also shipped several truckloads of ancillary parts and equipment for the transformers in late September of 2002. (*Id.* ¶ 84.) In late September 2002, Waukesha sent the transformer test reports that were required under Order 105080. (*Id.* ¶ 85.) Campone acknowledged that the reports showed the transformers met the technical specifications outlined in Order 105080. (Campone Dep., at 231-32.)

On October 10, 2002, the ancillary parts for the transformers arrived at the Osseo, Minnesota warehouse, but the Xcel or NRG personnel on site refused to permit the unloading of those parts. (Waukesha's 56.1 ¶¶ 87-88.) Mark Anderson of NRG explained in an October 10, 2002 letter to Waukesha that "the transformers and related parts are not NRG's property, [and] NRG is not accepting responsibility for any shipping, storage, or preservation costs." (Letter from Anderson to Kirshner of 10/10/2002, Ex. O to Waukesha's 56.1.) The letter also explained that NRG had previously "informed Waukesha that NRG did not hold title to the transformers, as the Purchase Order was never assigned to NRG." (*Id.*) Indeck's president Campone testified that John Brewster, a senior executive with NRG, acknowledged that the transformers were NRG's responsibility, but that NRG intended to reject the shipment because it could not pay for them. (Campone Dep., at 180.)

Waukesha asked Indeck for new shipping instructions (Waukesha's 56.1 ¶ 93), and Wayne Grayczyk responded through e-mail that the transformers should be re-shipped to a Waukesha facility in Waukesha, Wisconsin. (Waukesha's 56.1 ¶ 94; Grayczyk Message, Ex. Q to Waukesha's 56.1.) Waukesha followed those instructions, redirecting the rail and truck shipments carrying the transformers and ancillary parts to its Wisconsin facility. (Waukesha's 56.1 ¶ 95.) The 105080 transformers and parts have since remained at this storage facility, as Indeck has provided no

further shipping instructions. (*Id.* ¶ 96.) Indeck claims that any directions it gave Waukesha about shipping the transformers were provided only to ensure that the transformers would be stored in good condition pending resolution of the dispute between the various parties. (Indeck's 56.1 Response ¶ 86.) Indeck further contends that it gave shipping directions to Waukesha because "no one else would step up and give direction" and that its furnishing of these alternative shipping instructions is in no way indicative of accepting responsibility or ownership for the transformers. (*Id.* ¶ 88.) Waukesha objects to these contentions as being unsupported in the record and conclusory. (Waukesha's Re. ¶¶ 88-89.)

## E.    Amounts Payable

In early October 2002, after the shipment of the transformers, Waukesha issued invoices to Indeck for the remaining payments due on Order 105080. (Waukesha's 56.1 ¶¶ 97.) Three of the invoices were for 80% of the payment ($2,668,800) and three of the invoices were for 10% of the payment ($333,600). (*Id.* ¶¶ 98-99.) Indeck refused to pay any of the invoices, leaving $3,002,400 unpaid under Order 105080. (*Id.* ¶ 100, 103.) Indeck's Wayne Grayczyk took the payment invoices along with the transformer test reports, wrote "NRG-Bourbonnais L.L.C." on them, and sent them to NRG. (*Id.* ¶¶ 101-102; Grayczyk Dep., Ex. H to Waukesha 56.1, at 68-72.)

In addition to the amounts unpaid on these invoices, Waukesha seeks damages for the expenses incurred in re-shipping and storing the transformers. (*Id.* ¶ 104.) Specifically, Waukesha incurred expenses of $58,815 for the re-shipping and handling of the transformers and the ancillary parts to the Waukesha facility in Wisconsin. (*Id.* ¶ 105.) Waukesha also incurred expenses of $30,000 in preparing the transformers for storage, and expenses of $64,800 (to date) for storing the transformers. (*Id.* ¶¶ 106-107.)[3] Thus, Waukesha seeks reimbursement from Indeck for $133,615 (to date) in re-shipping and storage costs. (*Id.* ¶¶ 108-109.) Indeck contests these

---

[3]    Waukesha also initially claimed that it would have to incur damages of $84,000 to service the stored transformers with oil (Waukesha's 56.1 ¶ 109), but this claim has since been withdrawn.

claims and argues that it is not responsible for these additional expenses because Waukesha breached the contract by denying assignment to NBE. (Indeck's 56.1 Response ¶¶ 103-108.) Indeck also argues that Waukesha has not provided sufficient back-up documentation to support these additional expense claims, instead relying solely on the deposition testimony of Sam Solomon, vice president and chief financial officer of Waukesha. (Waukesha's 56.1 ¶¶ 104-109.) Indeck also specifically argues that it is more expensive to store the transformers on railway cars, as Waukesha has done, (Indeck's 56.1 Response ¶ 93), but Waukesha asserts that the specific storage arrangement Waukesha has negotiated in this case "does not make it cost prohibitive." (Waukesha's Response ¶ 93; Kirshner Dep., at 146-47.)

## F.     Efforts to Reassign the Transformers

After shipment of the transformers to the Waukesha facility, Indeck made efforts to find a new buyer or new project for the transformers. (*Id.* ¶ 111.) As part of this effort, Indeck contacted Siemens Westinghouse, the manufacturer of the combustion turbine engines for which the 105080 transformers were specifically designed to be compatible. (*Id.* ¶ 112.) According to Campone, Siemens reported that "most of the projects that they were selling combustion turbine [generators] to already had a line on transformers, and so they didn't see anything on the near – in the near terms that would be a possible outlet for these transformers." (Campone Dep., at 184.) Indeck also considered using the transformers in a new generation project. (Waukesha's 56.1 ¶ 115.) In October 2002, Campone told Waukesha's chief financial officer about another project, the Niles project, where the transformers might be used and asked the Waukesha CFO to "kind of bear with me to see if we can't somehow stick these with another project and all come out of this okay." (*Id.*, at 181-83.) No new project for the transformers has been identified to date, however. (Waukesha's 56.1 ¶ 118.) Campone explained the difficulty in finding a new project for the transformers: "[T]hese transformers will not work with, A, with [a] different combustion turbine [generator], or B, at a different interconnection voltage than was intended for the Bourbonnais

project." (Campone Dep., at 27.)

In order to make use of the transformers, a potential new buyer would have to either use an existing Siemens Westinghouse generator or purchase a new one. (Indeck's 56.1 Response ¶ 119.) A Siemens Westinghouse generator of the type that would be compatible with the transformers costs tens of millions of dollars; Indeck purchased its Siemens generators (Indeck does not say when) for approximately $35 million each. (Waukesha's 56.1 ¶ 121.) In the past three to four years, Waukesha has built only four other transformers with the same low side voltage as the 105080 transformers, and all of them were built for Indeck. (Id. ¶ 122.) In fact, out of Waukesha's hundreds of customers, no other customer has ordered a transformer with the specific low side voltage of the 105080 transformers. (Id. ¶ 123.) Waukesha's David Kirshner, manager for market development, testified: "As you can see, when you start adding up the probabilities they are almost zero to be able to use these [transformers] on someone else's project." (Kirshner Dep., at 31-32.) There is also no practical way to reconstruct or redesign the transformers to make them compatible with another generation project. (Waukesha's 56.1 ¶ 128.) Despite its efforts, Indeck has not located a new purchaser or project for the 105080 transformers. (Id. ¶ 129.)

## DISCUSSION

Indeck originally brought suit against Waukesha seeking declaratory relief and a ruling that NRG would be held responsible for payment on the three 105080 transformers. Waukesha filed this counterclaim against Indeck, seeking payment on the contract and reimbursement for additional expenses relating to the storage and re-shipping of the three transformers. Waukesha now seeks summary judgment in its favor.

## I. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). There is no genuine issue of material fact unless "a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States,* 180 F.3d 859, 861 (7th Cir. 1999) (internal quotations and citations omitted). The court must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). "[C]ontract interpretation is particularly suited for disposition on summary judgment." *United States v. 4500 Audek Model No. 5601 AM/FM Clock Radios,* 220 F.3d 539, 543 (7th Cir.2000).

## II. Breach of Contract

The elements of breach of contract are: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.,* 323 Ill. App. 3d 15, 26, 752 N.E.2d 33, 43 (1st Dist. 2001).[4] For the reasons discussed below, the court holds that there are no genuine disputes as to any of these elements, and that Waukesha is entitled to judgment.

### A. A Contract Was Formed

Purchase Order 105080 clearly establishes a valid and enforceable contract between Waukesha and Indeck. Indeck's president Campone admitted that Indeck "entered into a contract with Waukesha and we were proceeding as if that contract – we intended to fulfill all of the obligations of that contract." (Campone Dep., at 73.) Illinois law holds that an enforceable contract may be demonstrated with proof of offer and acceptance or partial performance. *Calo, Inc. v. AMF Pinspotters, Inc.,* 31 Ill. App. 2d 2, 9, 176 N.E.2d 1, 5 (1st Dist. 1961). Here, Indeck undoubtedly

---

[4] Waukesha asserts that under the "most significant contacts" test, Illinois state law is properly applied to Order 105080. *See CSX Transp., Inc. v. Chicago & Northwestern Transp. Co.,* 62 F.3d 185, 188-89 (7th Cir. 1995). Indeck does not challenge this assertion. Where the parties do not dispute the matter, this court may properly apply the law of the state in which the court sits. *See American Home Assur. Co. v. Stone,* 61 F.3d 1321, 1324 (7th Cir.1995).

14

accepted Order 105080 when it exchanged acknowledgment forms with Waukesha in December 2000. (Waukesha's 56.1 ¶¶ 35-36.) The parties also confirmed the existence of a contract by partial performance: after Waukesha tendered approval drawings to Indeck in March 2001, Indeck made the required 10% progress payment ($333,600) to Waukesha. (*Id.* ¶¶ 38-40.) Finally, the terms of purchase Order 105080 designate "Indeck Energy Services, Inc." as the "Owner" of the transformers. (*Id.* ¶¶ 32-34.) These facts are sufficient to establish Order 105080 as a valid, enforceable contract.

### B.  Waukesha Performed Under the Contract

The record also demonstrates beyond dispute that Waukesha performed its obligations under Order 105080. Performance occurs when a party discharges its obligations under a contract. *Wilkonson v. Yovetich*, 249 Ill. App. 3d 439, 449, 618 N.E.2d 1120, 1128 (1st Dist. 1993). Waukesha discharged its obligations under Order 105080 by timely designing, manufacturing, and shipping the transformers according to Indeck's instructions. (Waukesha's 56.1 ¶¶ 82-86.) Indeck admits that the test reports for the completed transformers showed that the transformers met the specific technical specifications of Order 105080. (*Id.* ¶ 86.) Waukesha shipped the transformers to Indeck's specified delivery location in Osseo, Minnesota, and then re-shipped the transformers at Indeck's instruction to the Waukesha facility in Wisconsin. (*Id.* ¶ 83, 95.) Indeck claims that it was just following instructions from the true owner, NRG, in giving these various shipping instructions, but, as explained below, the court agrees with Waukesha that the transformers were never assigned to NRG. Indeck remained legal owner of the transformers and was bound under the contract.

### C.  Indeck Breached the Contract and Waukesha Was Damaged

Indeck plainly breached its obligations under Order 105080. A party breaches a contract when it fails to perform a contractual obligation. *See Hessler v. Crystal Lake Chrysler-Plymouth, Inc.*, 338 Ill. App. 3d 1010, 788 N.E.2d 405 (2d Dist. 2003). Indeck admits that it refuses to pay the

$3,002,400 due under Order 105080. (Waukesha's 56.1 ¶ 100; Indeck's 56.1 Response ¶ 100.) This failure to pay is a material breach of Indeck's obligations. As Waukesha has clearly been damaged by Indeck's actions, breach of contract has been established as a matter of law.

## III. Indeck's Defenses

### A. Waukesha's Alleged Failure to Accept Assignment

Indeck offers two affirmative defenses to Waukesha's claims: (1) Waukesha first breached the assignment clause of the contract; (2) Indeck is freed from liability under the doctrines of impracticability and frustration of purpose. The court considers each defense in turn.

Indeck argues that it was released from its obligation to pay for the transformers because Waukesha first breached Order 105080 by failing to agree to the assignment of the transformers to NBE. The Order's assignment clause provides: "the Contract may not be assigned by either Party without the prior written consent of the other Party, which consent will not be unreasonably withheld." (Waukesha's 56.1 ¶ 31.) Indeck contends that Waukesha violated this provision by withholding consent to the proposed NBE assignment.

Indeck's attempted evasion of responsibility for the transformers based on this assignment argument fails for several reasons. First, assuming that Waukesha's duty to consent was triggered at all, Indeck has arguably waived the issue. The law is clear that a "party to a contract may not lull another into a false assurance that strict compliance with a contractual duty will not be required[,] and then sue for noncompliance." *Whalen v. K-Mart Corp.*, 166 Ill. App. 3d 339, 343-44, 519 N.E.2d 991, 994 (1st Dist. 1988); *see also Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir. 1979). In *Whalen*, a contract between a contractor and a subcontractor required the subcontractor to produce proof of insurance before work and payment would begin, but the contractor failed to demand the insurance certificate before allowing the subcontractor to begin work, thus waiving the provision. Here, similarly, after Waukesha made clear that it would not accept the proposed assignment without a payment guarantee, Indeck did not then assert that

Waukesha had breached the contract. In fact, Indeck admits that it "dropped" the proposed assignment, and never claimed that Waukesha had behaved unreasonably until much later. (Waukesha's 56.1 ¶¶ 71, 91.) It was not until *after* NRG rejected the arriving transformer parts and transformers in October 2002 that Indeck announced that Waukesha had breached the assignment clause. (*Id.* ¶¶ 90-91.) As noted, Campone claims to remember earlier discussions about the matter, but there is no evidence to support such a claim. If Indeck truly believed that Waukesha's May 2002 non-acceptance of the assignment were grounds for release from the parties' contractual duties, then Indeck was obligated to make this position known at the time, not five months later. This is exactly the type of "lulling" that *Whalen* prohibits. 166 Ill. App. 3d at 343, 519 N.E.2d at 994.

Even if Indeck's assignment argument is not waived, it must fail as a matter of law. In support of the argument, Indeck cites the testimony of numerous company officers, all of whom vow that in their many years in the business, this was the first time they ever encountered a problem in assigning a purchase order. (Indeck & I-PV's Response to Waukesha's Motion for Summary Judgment (hereinafter "Indeck's Mot."), at 4-5.) The experience of these officers notwithstanding, a party does not unreasonably withhold consent for an assignment unless the party proposing the assignment identifies an assignee who is "ready, willing, and able to take over" the party's obligations and who meets "reasonable commercial standards." *Jack Frost Sales v. Harris Trust & Sav. Bank*, 104 Ill. App. 3d 933, 944, 433 N.E.2d 941, 949-50 (1st Dist. 1982); *see also City & Suburban Distributors-Illinois, Inc. v. Stroh Brewery Co.*, No. 87 C 1409, 1996 WL 563534, at *4 (N.D. Ill. Oct. 1, 1996). In *Jack Frost*, a lessee operated and leased a bar and wanted to sell its interest in the bar to a third party, but the lessor did not allow the assignment. 104 Ill. App. 3d at 944, 433 N.E.2d at 948. The court ruled for the lessor, holding that if the proposed assignee "is of dubious financial responsibility, or has a poor payment record, the [party's] refusal to consent will not be found to be unreasonable," and "regardless of what might

later be shown in court the [party] is justified in refusing his consent until satisfactory proof of financial ability and responsibility is shown." *Id.* at 947, 433 N.E.2d at 950.

There is no evidence here that Waukesha acted unreasonably in rejecting the proposed assignment to NBE. Instead, the record shows that Waukesha did consider the proposed assignment, but failed to locate any credit history for NBE, and was therefore unwilling to transfer to NBE the obligation to pay more than $3 million dollars owing on the purchase order. (Waukesha's 56.1 ¶ 58, 63.) Indeck itself admitted that NBE was a "shell company," and that it possessed no information about the company's assets, profits, or losses. (*Id.* ¶ 62, 64; Campone Dep., at 163.) Where Indeck itself refused to provide payment assurance, it can not establish that Waukesha was unreasonable in rejecting the proposed assignment. (Waukesha's 56.1 ¶ 66.) Testimony of Indeck's officers that they had never previously experienced any difficulty with an assignment simply does not create a material dispute on this issue.

Indeck asserts that Waukesha imposed a higher standard on NBE than it had in previous circumstances. According to Indeck, at the time of the proposed assignment, NBE was a better credit risk than either Indeck or I-PV were at the time they entered into the Order 105080 agreement. Again, the court is not persuaded. Both Indeck and I-PV had a long history of buying and paying for transformers from Waukesha; NBE was a newly formed company with no credit history or other financial information. (Indeck's 56.1 Response ¶¶ 51-54.) Significantly, in the 105080 transaction, Indeck was named the owner of the transformers. (Waukesha's Re. ¶¶ 32-34.) Thus, in the initial transaction, Waukesha dealt with the parent company, Indeck, as well as a shell company, I-PV. In the proposed assignment, Waukesha was asked to deal only with an unproven shell company, NBE, with no parent guarantee. There is thus no evidence to suggest Waukesha acted unreasonably in employing a higher standard in the assignment than it did in the initial, or any other, transaction. Nor would Waukesha's decision to impose higher credit standards in late 2002 than it had employed in 2000 constitute unreasonableness.

## B. Commercial Impracticability and Frustration of Purpose

Indeck also seeks to avoid performance under the doctrines of commercial impracticability and frustration of purpose. Frustration and impracticability only apply where a party demonstrates that a basic assumption of a contract has changed in a non-foreseeable manner. *Northern Ill. Gas Co. v. Energy Cooperative, Inc.*, 122 Ill. App. 3d 940, 952, 461 N.E.2d 1049, 1059-61 (3d Dist. 1984) (holding that the frustration of purpose and commercial impracticability defenses did not invalidate a contract to sell gas supplies when the gas market suddenly changed, raising crude oil prices). Indeck argues that the bankruptcy of NRG, and the corresponding failure of Indeck's Bourbonnais project, both altered the basic assumptions of Order 105080. These events were certainly unfavorable to Indeck, but the contract was not conditioned on NRG's participation, nor on the success of the Bourbonnais project. In fact, the Indeck transaction with NRG did not occur until after Indeck had ordered the transformers from NRG in 2001. Ordinary business risks associated with market fluctuations, financial instability, or company failures have never been a sufficient basis on which to invoke frustration or impracticability because businesses knowingly take on such risks when they enter commercial transactions.

Because breach of contract has been found and both of Indeck's defenses prove unsuccessful, Waukesha is entitled to summary judgment.

## IV. Damages

The final issue confronting the court is the amount and nature of the damages from the suit. Waukesha seeks both the remaining money due on the contract, $3,002,400, and the additional shipping and storage expenses that arose from NRG's rejection of the transformers. As Order 105080 is a contract for the sale of goods, the Uniform Commercial Code ("UCC") governs the measure of damages.

## A. Contract Price

Under UCC 2-709(1), 810 ILCS 5/2-709(1), a seller will recover as damages the full contract

price of sold goods when either: (1) the goods have been "accepted" by the buyer; or (2) the goods have been "identified to the contract" and "circumstances reasonably indicate that [resale] effort will be unavailing." Both circumstances apply here and Waukesha is thus entitled to recover the unpaid portion of the contract price.

Indeck claims that it never accepted the transformers because it was acting at all times as if NRG was the true owner of the transformers. As evidence for this assertion, Indeck points to the following: NRG was reimbursing Indeck for any payments made on the transformers, the shipping instructions for the transformers were given through NRG, and the transformers were being used for an NRG project. (Indeck's 56.1 Response ¶ 17, 20, 25, 27, 30, 64, 71-76, 81-89.) Indeck further asserts that it was only acting as a facilitator and problem solver between Waukesha and NRG in giving the final shipping instructions to Waukesha, Wisconsin, and in trying to resell the transformers to a third party. The court is not persuaded by these arguments. Under the UCC, a buyer accepts goods when: (1) after a "reasonable opportunity to inspect" the goods, the buyer "fails to make an effective rejection" of the goods; or (2) the buyer "does any act inconsistent with the seller's ownership." 810 ILCS 5/2-606(1)(b), (c); *see also Spirit of Excellence, Ltd. v. Intercargo Ins. Co.*, 334 Ill. App. 3d 136, 777 N.E.2d 660, 673 (1st Dist. 2002) (holding that buyer performed an act inconsistent with seller's ownership, when buyer presented sales invoices and certificates to customs agents, and paid for car repairs). Indeck has accepted the transformers as a matter of law under both prongs of the test.

First, Indeck clearly had a reasonable opportunity to inspect the transformers and failed to reject them. Indeck acknowledged the approval drawings sent by Waukesha and admitted that the later test reports showed the transformers to have been appropriately constructed. (Waukesha's 56.1 ¶ 38, 40, 86.) Waukesha also shipped the transformers to both Osseo, Minnesota, and Waukesha, Wisconsin, at Indeck's request and has stored them there ever since. (*Id.* ¶¶ 94-96.) Indeck has had the opportunity for more than a year to inspect the transformers at the Waukesha.

20

Indeck has thus clearly satisfied the first prong of the UCC's acceptance test. In this regard, this case is very similar to *N. Bloom & Sons (Antiques), Ltd. v. Skelly*, 673 F. Supp. 1260, 1266 (S.D.N.Y. 1987), where "[b]y refusing to respond to [a seller's] repeated attempts at delivery, [the buyer] gave up her right of inspection, and thus accepted the goods."

Second, Indeck has taken numerous actions that are "inconsistent with [Waukesha's] ownership," and thus also confirm acceptance under the UCC. 810 ILCS 5/2-606(1)(c). Illinois courts have identified several acts inconsistent with a seller's ownership, including attempting to re-sell goods, *Lorenzo Banfi di Banfi Renzo & Co. v. Davis Congress Shops, Inc.*, 568 F. Supp. 432, 434 (N.D. Ill. 1983), and any other act which the buyer "would have no right to do if he were not the owner." *Spirit of Excellence*, 334 Ill. App. 3d at 151 n.3, 777 N.E.2d at 673 n. 3. In this case, Indeck sought another owner for the transformers after NRG's bankruptcy (Waukesha's 56.1 ¶¶ 112-14), and sought a new generation project for the transformers. (*Id.* ¶¶ 115-18.) Most importantly, after NRG rejected the transformers in August 2002, Indeck gave instructions to ship the transformers to the Waukesha facility in Wisconsin. (*Id.* ¶ 94.) Indeck would not have had the right to take any of these measures if it were not the true owner of the transformers.

Indeck has thus accepted the transformers, and it is not necessary to examine whether the transformers were "identified to the contract" and whether "circumstances reasonably indicate that [resale] effort will be unavailing." 810 ILCS 5/2-709(1)(b). It is clear, though, that in this case the goods are identified to the contract and any efforts to resell the transformers are unavailing given their highly specialized and unique configuration. The record establishes that the transformers were designed specifically to be compatible with the Siemen's Westinghouse generators. Indeck's president testified that the low side voltage of the 105080 transformers was "an odd voltage." (Campone Dep., at 23.) Where goods are manufactured to a purchaser's unique specifications, courts routinely apply section 709(1)(b) and measure damages by the contract price. See, *e.g.*, *Emanuel Law Outlines, Inc. v. Multi-State Legal Outlines, Inc.*, 899 F. Supp. 1081, 1089 (S.D.N.Y.

1995) (giving contract price to seller because legal outlines were prepared under buyer's specific guidelines and thus have no value to other buyers). The court concludes that the transformers in this case are unique enough to make any resell effort "unavailing," and thus the UCC's two-prong test for determining whether to award the contract price is satisfied on either prong. 810 ILCS 5/2-709(1)(a), (b). Indeck is required to pay to Waukesha the $3,002,400 due on Order 105080.

### B.    Incidental Damages

Waukesha also seeks recovery for the transportation, storage, and maintenance expenses incurred after NRG turned away the transformers in October 2002. Section 2-710 of the UCC holds that a seller's damages include "incidental damages," such as "charges, expenses or commissions incurred in stopping delivery, [and] in the transportation, care and custody of goods after the buyer's breach." 810 ILCS 5/2-710; *Commonwealth Edison Co. v. Allied Chem. Nuclear Prods., Inc.*, 684 F. Supp. 1429, 1432 (N.D. Ill. 1988) (holding that seller may recover "costs for transportation, storing, or reselling the goods"). Waukesha claims it incurred expenses of: (1) $58,815 for the re-shipment of the transformers from Minnesota to Wisconsin; (2) $30,000 to prepare the transformers for storage; and (3) $5,400 per month since October 2002, for storage of the transformers. (Waukesha's 56.1 ¶¶ 104-108.)

Indeck resists liability for these additional expenses on the grounds that: (1) Waukesha first breached the contract by not agreeing to the assignment to NBE; and (2) Waukesha bears the responsibility for these expenses because it went ahead with shipping the transformers after being told not to by NRG. (Indeck's 56.1 Response ¶¶ 104-108.) Both of these defenses fail. The court has already established that Waukesha did not act unreasonably in denying assignment to NBE, and further held that Indeck breached Order 105080. As to the second argument, Waukesha was justified in refusing to follow NRG's shipping instructions in the absence of approval from Indeck. Because the proposed assignment was never completed, Indeck remained the owner of the transformers and Waukesha was under responsibility to adhere to directions from Indeck—not from

22

NRG. The record shows that after NRG told Waukesha to delay shipment, Waukesha contacted Indeck, which said that it would not rescind or alter its August 26, 2002 instruction to ship the transformers to Minnesota. (Waukesha's Response ¶ 76.) Waukesha thus properly carried out Indeck's orders concerning shipment. Indeed, these facts show that Indeck was responsible for the transformers being shipped to Osseo, Minnesota without NRG's approval, and should thus pay for the various additional expenses.

The court notes that while Indeck attempted, and failed, to find a substitute buyer or project for the transformers, the record is silent concerning any efforts undertaken by Waukesha to mitigate its damages. Illinois law requires a seller to take "reasonable measures to mitigate the damages recoverable" when a contract is breached. *Kallman v. Radioshack Corp.*, 315 F.3d 731, 740 (7th Cir. 2002). Although Waukesha does not appear to have taken independent efforts to find a buyer for the 105080 transformers, the court concludes that such fact does not preclude summary judgment in its favor. Waukesha communicated closely with Indeck during Indeck's efforts to mitigate the loss. For example, Indeck president Campone had many conversations with Waukesha's Dennis Wiser about Indeck's attempts to find another use for the transformers. (Campone Dep., at 181-82.) Campone characterized these discussions as a *mutual* attempt to mitigate the loss: "So we were trying to – I was trying to with Dennis mitigate what I thought was a bad hand that had been dealt to both of us by NRG." (*Id.*, at 182.) Later, Wiser told Campone, "I know you're trying to help us out. Let's see if we can make a go of this [another Indeck project that the transformers were tentatively scheduled to be used on]." (*Id.*, at 184.) The record thus establishes that Waukesha did work closely with Indeck in Indeck's attempts to find another buyer or project, in spite of the highly specialized nature of the transformers. (Waukesha's 56.1 ¶¶ 119-127.) Waukesha notes that it had built only four other transformers like those at issue, and they were sold to Indeck (presumably to connect with a Siemens Westinghouse generator). (Id. ¶¶ 122-23.) Given Indeck's failed attempts to locate another use for the transformers and the unique

configuration of the transformers, there is no basis to conclude that Waukesha would have found a way to mitigate its loss through another buyer or project.

Indeck also contests all of Waukesha's figures with respect to these additional costs, claiming that they are unsupported by "back-up documentation." (Indeck's 56.1 Response ¶¶ 104-108.) While Waukesha does not provide any more documentation to support these expenses than the deposition of Sam Solomon, its vice president and chief financial officer (Waukesha's 56.1 ¶¶ 104-109), Indeck has provided no evidence that Waukesha could have somehow met these expenses more economically. In the absence of any evidence contradicting Waukesha's claims, especially given the costly nature of shipping and storing these transformers, the court will award the amounts requested for Waukesha's additional storage and transportation expenses.

## CONCLUSION

For the reasons set forth above, Waukesha's motion for summary judgment (Doc. No. 23-1) is granted. Judgment is entered in favor of Waukesha and against Indeck and I-PV in the amount of the unpaid purchase price of $3,002,400 for the 105080 transformers. It is further ordered that Indeck and I-PV pay Waukesha: (1) $58,815 for the re-shipment of the transformers; (2) $30,000 for the preparation of the transformers for storage; and (3) $5,400 per month from October 2002 to date, for the storage of the transformers.

ENTER:

Dated: September 16, 2004

REBECCA R. PALLMEYER
United States District Judge

24